## Commonwealth v. Hegedus

*Lawrence Weider*, for Commonwealth.
*Richard G. Greco*, for defendant.

BAYLEY, *J.*, August 2, 1984—This is an appeal from the Department of Transportation's suspension of the petitioner's operating privileges for 12

months for a refusal to submit to a chemical test of her blood pursuant to the Vehicle Code §1547(b)(1).

Section 1547(a) provides:

"General rule.—Any person who drives, operates or is in actual physical control of the movement of a motor vehicle in this Commonwealth shall be deemed to have given consent to one or more chemical tests of breath, blood or urine for the purpose of determining the alcoholic content of blood or the presence of a controlled substance if a police officer has reasonable grounds to believe the person to have been driving, operating or in actual physical control of the movement of a motor vehicle:

(1) while under the influence of alcohol or a controlled substance or both; or

(2) which was involved in an accident in which the operator or passenger of any vehicle involved or a pedestrian required treatment at a medical facility or was killed."

## FINDINGS OF FACT

1. Petitioner was involved in a motor vehicle accident in Silver Spring Township, Cumberland County, Pa., in the early morning hours of May 15, 1984.

2. Patrolman Edward L. Shaffer, Jr., of the Silver Spring Township Police Department responded to the scene of the accident where he discovered petitioner trapped in her wrecked vehicle. She was the only person in her car and when the officer put his head into it, noticed the odor of alcoholic beverages.

3. An examination of the accident scene convinced the officer that petitioner had crossed over the center line of a highway and collided with an oncoming tractor-trailer.

4. Petitioner was removed from her vehicle and taken to the Holy Spirit Hospital for medical treat-

ment. After examining the accident scene, the officer proceeded to the hospital for further investigation because he felt that petitioner had been operating while under the influence of alcohol.

5. The officer, after being informed by a nurse that petitioner suffered from a broken jaw, located her in an examining room. He recognized that she had been injured. When asked about the accident she told him that she had no idea of what had taken place.

6. The officer then arrested petitioner with sufficient probable cause to believe that she had been operating her vehicle while under the influence of alcoholic beverages. He advised her of her constitutional rights. Realizing that she was in no condition to submit to a chemical test of her breath, he requested that she allow a blood sample to be taken for the purposes of determining the alcoholic content of her blood. He advised her that her license would be suspended for one year if she refused to submit to the blood test.

7. The officer could understand petitioner although it was obvious to him that she was in pain and discomfort from her injuries. He observed her bleeding from the mouth and noticed she had difficulty in talking.

8. This request for a blood test brought no response from petitioner. She just looked at him. The officer then went to the nursing station where he filled out a written certification that a request for a blood sample had been refused by petitioner. He then went back to the examining room where he again asked petitioner to submit to a blood test. A nurse and nurse's aid were present. Although the officer was in uniform and displayed a badge, petitioner told him she would not submit to a test be-

cause she did not know who they were and she wanted to talk to her mother first.

9. At·the time the officer requested the blood test he knew that medical personnel at the Holy Spirit Hospital had already taken a blood sample for medial purposes. The results of this blood test have since been subpoenaed from the hospital and admitted against petitioner at a preliminary hearing on the criminal charge of driving under the influence that she is facing as a result of this accident.

10. Petitioner does not now remember anything about the accident or anything about the incidents in the examining room of the hospital as set forth above.

11. Petitioner did not remember anything about the accident during the time period in which Officer Shaffer requested her to take the test.

12. Petitioner's medical records, duly authenticated and admitted into evidence, show that upon admission to the hospital she suffered from the following injuries and conditions as a result of her automobile accident:

(1) No memory of accident.

(2) Disorientation.

(3) Severe jaw pain.

(4) A facial injury with lacerations of the upper lip into the nose.

(5) Lacerations of chin and instability of jaw.

(6) Laceration and puncture wound of the chest.

(7) Bruised and cut knee.

(8) Abrasions and contusions of hip.

(9) Blood in the mouth which required suctioning out.

13. Following her encounter with Officer Shaffer, the lacerations on her face were sutured and she was admitted to an operating room where under general anesthesia an open reduction of the

mandibular (jaw) and interosseous wiring and arch bar application was performed.

14. Petitioner was discharged from the hospital nine days later on May 24, 1984.

## DISCUSSION

Petitioner maintains that the evidence presented at the hearing before this court on July 24, 1984, satisfies her burden of showing that she was incapable of making a knowing and conscious refusal of Officer Shaffer's request for her to submit to a blood test.

In order to suspend operating privileges under §1547 the Commonwealth must prove the following:

"(1) that the defendant was placed under arrest upon the charge of driving while intoxicated, and the arresting Officer had reasonable grounds to believe the defendant was driving while intoxicated; (2) that he was requested to submit to a breathalyzer test; and (3) that he refused to do so. Department of Transportation, Bureau of Traffic Safety v. Kelly, 18 Pa. Commonw. 490, 335 A.2d 882 (1975).

If the Commonwealth proves the above elements:

"The burden of proof then shifted to the appellant to prove that he was physically incapable of making a knowing and conscious refusal to take the breathalyzer test. Commonwealth v. Passarella, 7 Pa. Commonwealth Ct. 584, 300 A.2d 844 (1973). Whether a driver is incapable of making a knowing and conscious refusal is a question of fact for the fact-finder, in this case the lower court." Herring v. Commonwealth, 50 Pa. Commw. 608, 413 A.2d 1171 (1980).

The circumstances of a refusal to take the test which triggers the right of the Commonwealth to

suspend operating privileges ". . . depends on whether the refusal was a conscious and knowing act." Bureau of Traffic Safety v. Tantlinger, 29 Pa. Commw. 536, 371 A.2d 1037 (1977). It is for the court "to infer from all the evidence that [the petitioner] was incapable of making a knowing refusal, or to reject his testimony that he suffered from an incapability to do so." Herring v. Commonwealth, supra.

Citing Brinkerhoff v. Bureau of Traffic Safety, 59 Pa. Commw. 419, 430 A.2d 338 (1981), the Commonwealth maintains that the petitioner's testimony and the medical records of the hospital admission are alone insufficient to meet the burden of showing that her refusal to take the test was not a knowing and conscious act. The Commonwealth's position is that this burden requires the testimony of a medical expert; albeit an opinion of the expert supporting petitioner's claim of an inability to make a knowing and conscious refusal.

In Brinkerhoff, defendant was asked to submit to a breathalyzer test at a police station. He failed to blow sufficient air into the apparatus and claimed that he had not refused to take the test because he was incapable of completing the test and had attempted in good faith to do it. On these facts, citing Bureau of Traffic Safety v. Hanes, 49 Pa. Commw. 407, 411 A.2d 571 (1980), and Bureau of Traffic Safety v. Kelly, 18 Pa. Commw. 490, 335 A.2d 882 (1975), the Commonwealth Court held that competent evidence to prove the physical inability to take the test requires "supportive medical evidence."

In Commonwealth v. Tantlinger, 29 Pa. Commw. 536, 371 A.2d 1037 (1977), the facts were as follows:

"Mr. Tantlinger, while driving his automobile alone at about 1:20 o'clock A.M. on December 27,

1974, lost control of his vehicle, which overturned in the public road. The police officer who investigated found a partially consumed pint of whisky at the scene and noticed the smell of alcoholic drink on Mr. Tantlinger's person. The officer went to the hospital to which Mr. Tantlinger was taken and there asked Mr. Tantlinger to take a breathalyzer test. Mr. Tantlinger consented to take the test and the police officer sent for the breathalizer apparatus. At this point in the history the evidence becomes conflicting. The police officer testified that when the apparatus arrived Mr. Tantlinger refused to take the test. A magistrate, whom the police officer later called to the scene, testified that Mr. Tantlinger refused to take the test in his, the magistrate's presence. Mr. Tantlinger's brother testified for Mr. Tantlinger that he, the brother, told the police officer at the hospital that he did not want his brother to take the breathalizer test until he had received medical treatment. Mr. Tantlinger testified that he consented to the test and that he at no time refused to take the test."

The Commonwealth Court noted that the trial judge, who reversed the suspension of Tantlinger's operating privileges noted that Mr. Tantlinger was injured in the accident, that the police officer stated that Mr. Tantlinger was in a 'lesser state of shock' at the roadside scene of the accident, that the magistrate in answer to the question posed by the trial judge stated that he was unable to say whether Mr. Tantlinger was able to understand the request that he take the test and that Mr. Tantlinger was indeed injured.

The court concluded:

"We will reverse and remand. In doing so we are impelled to say, should the trial judge find that Mr. Tantlinger in fact refused to take the test, that the

effectiveness of the refusal depends on whether the refusal was a conscious and knowing act. Commonwealth v. Passarella, 7 Pa. Commonwealth Ct. 584, 300 A.2d 844 (1973), must be consulted on this point. There the operator testified that he had no recollection of refusing to take the test and produced testimony about hospital records showing that he had suffered a possible concussion. The trial judge concluded that there was no willful refusal because the hospital records convinced him that the operator was incapable of making a conscious, knowing decision. We reviewed the record and reversed, noting that no doctor testified that the driver had suffered a concussion; that no medical evidence was adduced as to the effect of a concussion at the time of refusal; and that the testimony about the medical records was of doubtful validity. We decided that the evidence did not support the trial judge's conclusion that the refusal was not willful, knowing and conscious, and reversed. We are compelled to make the same conclusion on this record."

An examination of the facts of Passarella, reveal that he had already been discharged from the hospital and taken to a police lockup, at which time the test refusal was made. The Passarella court concluded at pp. 586 and 587:

"No medical doctor testified that appellee suffered an actual concussion; no medical evidence was introduced as to what effects such a concussion would have had on appellee after he was released from the hospital. Testimony as to appellee's medical 'record' were of doubtful validity and merely indicated that a 'possible' concussion occurred. As said in Commonwealth v. Harris, 351 Pa. 325, 330, 41 A.2d 688, 691 (1945), quoted in Scannella v. Salerno Importing Co., 2 Pa. Commonwealth Ct. 11, 15, 275 A.2d 907, 909 (1971): 'Certainly every "act,

condition or event" which some hospital physician places in a hospital record does not *ipso facto* become competent when later an issue is being judicially tried to which such fact would be relevant *if proved by competent testimony.*' (Emphasis in original).

In the present case the medical records of petitioner's admission and ten day hospital stay following her accident were properly authenticated and admitted into evidence. Coupled with petitioner's own testimony and that of Officer Shaffer, we have no doubt as to the validity of these records and their reliability in setting forth the injuries she received and the condition she was in during the period of time the officer sought her permission to take the test.

Based upon the above authorities we reject the Commonwealth's contention that medical testimony is required to support a petitioner's claim, in all cases, on the issue of whether or not the refusal to take a test was a conscious and knowing act. Where the evidence shows that a petitioner was obviously injured and suffering from those injuries at the time the request for the test was made, unlike the facts upon which Brinkerhoff, Tantlinger and Passarella were decided, we must look to all of the evidence, including the police officer's testimony, petitioner's testimony, and the medical records which we conclude are reliable, in order to determine whether or not the refusal was a conscious, knowing act.

Based upon all of the evidence I find as a fact that the petitioner did not make a conscious and knowing refusal not to submit to the blood test requested by Officer Shaffer. I believe her testimony that she had no memory of the accident upon her admission to the Holy Spirit Hospital. I believe her testimony that she has no memory now of what occurred in

that examination room. The reliable evidence shows that she was suffering from considerable trauma at the time Officer Shaffer requested her to submit to a test. Her jaw had been broken, she was bleeding from the mouth, she had a laceration which extended from her nose into her upper lip, she had other lacerations and abrasions about her body, she was in severe pain, she had no memory of the accident and she was disoriented. The nurse's notes in the medical record reflect her disorientation; that fact is further evidenced by her failure to even respond to the police officer when he first asked her to take the test and her statement to him upon his second request that she did not know who he was even though she had been talking to a person in uniform with a badge who had been discussing an automobile accident with her. Mosby's Medical and Nursing Dictionary, (C. V. Mosby Company, 1983), defines disorientation as a "state of mental confusion characterized by inadequate or incorrect perceptions of place, time or identity."

The Commonwealth asks us to conclude that her refusal to take the test was a knowing and conscious act on the tenuous argument that the evidence shows at one point she told Officer Shaffer she understood her rights; at another point she told him she would not take the test and further that the nurse's notes in the hospital record reflect that she responded to commands. Responding to commands in the injured and disoriented state she was in is a far cry from her being able to make a conscious and knowing refusal to submit to a blood test.

We have a duty to review the evidence in its totality. That reliable evidence in this record convinces me that the petitioner's physical condition at the time Officer Shaffer asked her to submit to a blood

test was such that her failure to take the test was not her knowing and conscious act.

## ORDER OF COURT

And now, this August 2, 1984, the order of the Department of Transportation, Bureau of Traffic Safety, suspending for 12 months the operating privileges of Sandra Ann Hegedus, is reversed.